# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
Civil Action No. 1:14-CV-00193

| | | |
|---|---|---|
| TERESA ANN HENSLEY, et al. | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF LAW** |
| v. | ) | **SUPPORT OF DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| BOBBY R. SUTTLES, et al | ) | **JUDGMENT** |
| Defendants. | | |

NOW COME Defendants and submit this Brief in support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Defendants respectfully request that their Motion for Summary Judgment be GRANTED.

## STATEMENT OF THE CASE

Plaintiffs filed their Second Amended Complaint on December 1, 2014 seeking compensatory and punitive damages pursuant to 42 U.S.C. § 1983 and various state common law claims. (D.E. 26). Defendants filed their Answer to the Second Amended Complaint on January 29, 2015, denying liability and asserting various affirmative defenses. (D.E. 29). On February 23, 2015, the Court entered a Pretrial Order and Case Management Plan and after a period of discovery, Defendants timely filed their Motion for Summary Judgment on December 1, 2015. Defendants now contemporaneously file this memorandum of law in support of said motion.

1

## STATEMENT OF THE FACTS

This lawsuit arises out of an incident that occurred in the early morning hours of August 9, 2012 when David Hensley ("Hensley") was shot and killed by two Haywood County Sheriff's Deputies (collectively sometimes "the Deputies") - Lieutenant Michael Price ("Lieutenant Price") and Deputy Keith Beasley ("Deputy Beasley") - after Hensley pointed a firearm at Deputy Beasley from his porch, assaulted his teenage daughter with the firearm in the Deputies presence, and finally proceeded to advance towards Price and Beasley with the firearm pointed at Deputy Beasley for a second time.

The undisputed facts are as follows: on the evening of August 8-9, 2012, Hensley was at his home with two of his daughters - Plaintiff H.H. (a minor) and Plaintiff Rachelle Ferguson ("Rachelle"). (D.E. 26, ¶ 14). At some point during the night, Hensley became increasingly emotionally disturbed. He woke his daughter Rachelle and asked her to read to him out of the Bible both in their house and out on the front porch. (R. Ferguson dep. pp. 42-43). Hensley told Rachelle that he believed the world was ending. (R. Ferguson dep. p. 44). He told her that it was the end of time and that it was up Rachelle and her mother to kill the rest of their family. *Id.* H.H. also remembers hearing Hensley talk about the world coming to an end. (Dep. of H.H. pp. 49-50). Because of the way her dad was acting, Rachelle called 911, but once they picked up, she told them everything was

2

okay. (R. Ferguson dep. p. 44). When Rachelle told Hensley that she had called 911, he told her that no one would answer, because no one else was living. (R. Ferguson dep. p. 45).

In addition to 911, Rachelle also called her grandmother, Shirley Ferguson, who lived nearby, and asked her to help her take Hensley to the hospital. (R. Ferguson dep. pp. 46-47). Her grandmother told her that she could not help her go to the hospital because she needed to get the children who were staying with her ready for school. *Id*. Shirley Ferguson testified that the reason she would not go over to help with Hensley is because she was "afraid". (Dep. of S. Ferguson, pp. 12-13). Shirley Ferguson testified: "Well, she called me, he was sick. He has a chemical imbalance. And I had a sister that was like that. And sometimes when she went off she got violent. And I was afraid that he might get violent and might cause us to have a bad wreck." (S. Ferguson dep. p. 12:16-20). In addition to her grandmother, Rachelle also called her mother, who was at work at the time, asking for help because she was scared. (R. Ferguson dep. p. 50). Rachelle's mother did not arrive back home until after her work shift ended and the incident had occurred.

After speaking with Rachelle the first time, Shirley Ferguson called the Hensley's home in the early morning. She testified that Hensley answered the phone and told her that he was "going to kill the GDB with a knife" and slammed

3

the phone down. (S. Ferguson dep. pp. 13-14). After Hensley hung up the phone on her, Ms. Ferguson called 911. (S. Ferguson dep. pp. 14-15).

Shortly thereafter, two Haywood County Sheriff's vehicles, who had been dispatched after Shirley Ferguson's 911 call, approached the Hensley the residence. According to Rachelle, when Hensley noticed cars coming toward their home, he went into his bed room and retrieved his gun from his gun safe. (R. Ferguson dep. pp. 53-56; H.H. dep. pp. 28-29). At that time, Rachelle indicated Hensley was still under the impression that the world was coming to an end. (R. Ferguson dep. p. 54). When Hensley took the gun from his safe, Rachelle and H.H. tried to stop him, but were unable to. (R. Ferguson dep. pp. 56, 58; H.H. dep. pp. 29-31). All three went from Hensley's bedroom out onto the front porch. (R. Ferguson dep. p. 57; H.H. dep. p. 31). As they entered the porch, Hensley, Rachelle, and H.H. could see two police cars in the driveway according to Rachelle. (R. Ferguson dep. p. 60).

Around that same time, Deputy Beasley and Lieutenant Price arrived at Hensley's residence in response to Shirley Ferguson's 911 call. The officers were in their respective law enforcement vehicles and dressed in their law enforcement uniforms. (Dep. of Beasley pp. 60, 66-67). Price and Beasley pulled up to Hensley's residence and came to a stop. (Dep. of Beasley. pp. 70-72.) Beasley's vehicle was in front and Price's vehicle was initially located approximately five

4

feet behind Beasley's vehicle. (Dep. of Price p. 55). As they came to a stop, the deputies saw Hensley exit the home and come to the railing of the front porch, lean over, and point a gun at Beasley. (Beasley dep. p. 72; Price dep. pp 56, 59). Price testified: "The front door swung open. A white male came out on the porch and leaned over the banister, the handrails, and was pointing a gun at Keith." (Price dep. p. 56). Price continued: "[Hensley] had his hands extended and was pointing a handgun at Keith Beasley." (Price dep. p. 59). When Hensley pointed the gun at his vehicle, Beasley immediately lay down across his center console and notified Lieutenant Price via radio that Hensley had a gun. (Beasley dep. p. 74-76).

At that time, Lieutenant Price repositioned (backed up) his vehicle and exited the vehicle. (Price dep. p. 60.) After exiting the vehicle, Lieutenant Price witnessed an altercation between Hensley and his daughters. (Price dep. pp. 62-64). As Hensley, Rachelle, and H.H. were on the porch, Rachelle and H.H. again tried to get the gun away from their father. (R. Ferguson dep. p. 70). During the altercation on the steps of the porch, Hensley hit Rachelle on the back of the head with the gun at least one time. (R. Ferguson dep. pp. 69-72; H.H. dep. pp. 36-38) Price testified, "I seen the male hit the female with the pistol in the back of the head." (Price dep. p. 64). According to Rachelle, Hensley hit her at least one time, but it could have been more. (R. Ferguson dep. p. 71). After striking Rachelle, Hensley left the porch, went down the steps, and into the yard toward the Deputies.

5

(R. Ferguson dep. pp. 73-74, Price dep. pp. 67-71, H.H. dep. pp. 38-41). As Hensley into the yard, he turned to his head towards his daughters and told them he loved them. (H.H. dep. pp. 40-41).

During this time, Lieutenant Price had radioed indicating that Hensley had a gun. (Beasley dep. pp. 79-80). Upon hearing Lieutenant Price's warning of "gun, gun, gun," Deputy Beasley undid his seatbelt and pulled out his weapon. *Id.* Deputy Beasley opened his door, began to exit his vehicle, and saw Hensley coming quickly towards him from the porch with the gun. (Beasley dep. pp. 82-86). Price testified Hensley taking "a brisk walk to the direction of where Keith was at his patrol car." (Price dep. p. 72). After Hensley walked off the porch, Beasley saw Hensley pointing the gun him a second time. (Beasley dep. p. 90; Price dep. p. 70). As Price testified, "When [Hensley] hit the bottom of the steps, the next time I seen [the gun] is when he pulled the gun back up and pointed it at Keith." (Price dep. p. 70). Once Hensley pointed his gun at Deputy Beasley for a second time while moving through the yard towards Deputy Beasley, both Lieutenant Prince and Deputy Beasley fired their weapons at Hensley. (Beasley dep. p. 90, Price dep. p. 73). Said Lieutenant Price, "When the man came off the porch and raised his weapon in the direction of where Keith was at, is when I fired my first shot." (Price dep. p. 73). According to Beasley, at the time he began to fire upon Hensley, he was focused on stopping the threat of imminent force caused

6

495372 v1

by Hensley pointing his weapon at the officers and approaching them. (Beasley dep. p. 94). Hensley was struck and killed by one the bullets fired by the officers. At the time the deputies began to fire, Hensley was approximately 10-15 yards from Beasley's vehicle. (Beasley dep. p. 88; Price dep. p. 79).

Both Lieutenant Price and Deputy Beasley testified that Hensley was approaching them with his gun pointed at Deputy Beasley when they began to fire their weapons at Hensley. (*See* Beasley dep. p. 90 "The gun came back up pointed at me … At that point I started firing"; Price dep. p. 73, "When the man came off the porch and raised his weapon in the direction of where Keith was at, is when I fired my first shot."). This testimony is the only evidence of the location of Hensley's gun at the time he was shot. Importantly, neither Plaintiff Rachelle nor Plaintiff H.H. is able to recall the location or position of the gun in Hensley's hand after he left them on the porch.

Rachelle testified she did not know where the gun was positioned:

> Q. Your dad had the gun still with him when he was walking
>    down the stairs; right?
> A. Yes.
> Q. At any point did you see him drop the gun?
> A. No.
> Q. What hand did he have the gun in?
> A. I don't know.
> Q. Did you see the gun when he was walking down the
>    stairs?
> A. I don't recall.

495372 v1

> Q. Did you see the gun at any point when he was walking in the yard?
> A. I don't recall.
> Q. You don't recall seeing it?
> A. I don't recall seeing the gun.

(Rachelle dep. p. 75). H.H. also testified on multiple occasions that although she believed that Hensley's arms were by his sides, his back was to her and she didn't know where the gun was positioned once Hensley left the stairs:

> Q. You said when he turned towards you the gun wasn't in his right hand.
> A. Yes.
> Q. Where was it?
> A. I don't know.
> Q. You didn't see it?
> A. No.

(H.H. dep. p. 41).

> Q. Now, you testified earlier that when your dad was walking down the stairs you didn't see the gun in his right hand anymore. Is that right?
> A. Correct.
> Q. You didn't see it in his left hand either, did you?
> A. I said I don't know if it was in his left hand.
> Q. Did you see it?
> A. No.
> Q. Did you see the gun at any point after he --
> A. No.
> Q. -- left the stairs? So when he turned to look at you --
> A. It was not in his right hand.
> Q. Yes, ma'am. That is not my question. When he turned to look at you, you did not see the gun; is that right?
> A. No.
> Q. You didn't see it?
> A. No.

495372 v1

Q. At no point did you see it after he left the stairs; right?
Q. No.

(H.H. dep. p. 67).

Q. Where was the gun?
A. I don't know.
Q. Because you couldn't see it; right?
A. I couldn't see it.

(H.H. dep. p. 69).   The only evidence regarding the position of the gun after Hensley walked off the stairs is the testimony of Lieutenant Price and Deputy Beasley, who both testified that the gun was pointed at Deputy Beasley.

After Hensley was shot, emergency medical personnel responded to the scene.   The medical personal included Brad Melton and Belinda Hamlin of Haywood County Emergency Services.   (*See* Aff. of Brad Melton ¶ 3; Aff. of Belinda Hamlin ¶ 3).   Hensley was pronounced dead on the scene.   *Id.*   In addition to checking Hensley, Melton and Hamlin treated Plaintiff Rachelle Ferguson. (Hamlin Aff. ¶ 4).   Ferguson was treated for injuries to her head and finger.   *Id.* During the treatment of Ferguson, both Hensley and Melton heard Ferguson say something to the effect of "he was getting me really good, thank God the police showed up when they did."   (Melton Aff. ¶3; Hamlin Aff. ¶ 3).   The  State  Bureau of Investigation ("SBI") conducted an investigation into the incident.   Following its investigation, which included interviews with the Hensley's family members at

9

the scene, the officers involved, and other emergency personnel present, no charges were filed against the Defendants.

## STANDARD OF REVIEW

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, *Anderson*, 477 U.S. at 248-49, but "must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis and quotation omitted).

## ARGUMENT

I. **PLAINTIFFS' § 1983 CLAIMS AGAINST THE DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES ARE BARRED BY QUALIFIED IMMUNITY**

Plaintiffs allege that the Defendants actions violated their civil and constitutional rights. However, Defendants in their individual capacities are entitled to the protection of qualified immunity.[1] In *Harlow v. Fitzgerald*, 457 U.S.

---

[1] Notably plaintiffs do not make any allegations nor is there any evidence that Defendants Suttles, Bryson, or Mitchell in their individual capacities were involved in the incident in any way and therefore the claims should be

495372 v1

800 (1982), the Supreme Court held that governmental officials, such as police officers, who are sued individually for constitutional and federal statutory violation, are protected by a qualified immunity. "Qualified immunity shields government officials from civil damages unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. ___, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (slip op. at 5). Officers are protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Dunbar v. Lindsey*, 905 F.2d 754, 763 (4th Cir. 1990), and "gives ample room for mistaken judgments." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *See also Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) ("When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.").

The qualified immunity analysis involves two questions -- both of which must be answered yes for a plaintiff to proceed. *Clem v. Corbeau*, 284 F.3d 543 (4th Cir. 2002). The first question is whether the evidence establishes the violation of a constitutional right. *Id.* If the answer is yes, the next question is whether the

---

dismissed as to these defendants.

495372 v1

right was "clearly established" at the time of the events at issue. *Clem*, 284 F.3d at 549 (citations omitted). "To be clearly established, a right must be sufficiently clear that every reasonable officer would have understood that what his is doing violated that right." *Riechele v. Howards*, 566 U.S. ___, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)(slip op. at 5).

In this case, it is well settled that an officer may use deadly force when the office has probable cause to believe that a threat of serious physical harm exists. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In *Graham v. Conner*, 490 U.S. 386, 396 (1989), the U.S. Supreme Court stated: "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." An officer is not liable for the alleged use of excessive force if the officer's actions were *objectively reasonable* in light of the facts and circumstances confronting the officer, including the nature of the threat imposed by the suspect and whether the suspect was resisting arrest. *Id.*

A reviewing court is not to weigh an officer's conduct through the lens of "20/20 hindsight" when evaluating reasonableness. *Graham*, 490 U.S. at 396. Rather, "a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Id.* The exclusive focus of the inquiry should be on the information known to the officer or officers "'*immediately prior to and at*

12

495372 v1

Case 1:14-cv-00193-MR-DLH   Document 40   Filed 12/01/15   Page 12 of 27

*the very moment [they] fired the fatal shot*.'" *Greenidge v. Ruffin*, 927 F.2d 789,

792 (4th Cir. 1991) (*quoting Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988)

(*quoting, in turn, Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)). "The

officers on the beat are not often afforded the luxury of armchair reflection." *Elliot

v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). Moreover, the "reasonableness" must

"embody allowance for the fact that police officers are often forced to make split-

second judgments - in circumstances that are tense, uncertain, and rapidly evolving

- about the amount of force that is necessary in a particular situation." *Id.* at 396-

97.

 The use of deadly force implicates special considerations under the

reasonableness analysis. "A police officer may use deadly force when the officer

has sound reason to believe that a suspect poses a threat of serious physical harm to

the officer or others." *Elliot*, 99 F.3d at 642 (*citing Tennessee v. Garner*, 471 U.S.

1 (1985)). In this case, the Defendants were clearly reasonable in their perception

that Hensley posed a threat of serious bodily harm thereby justifying the use of

potential deadly force.

 The following facts are uncontested: Beasley and Price were responding to a

911 call for assistance at Hensley's residence at the time of the incident. As they

reached the residence, both officers witnessed Hensley with a firearm on his porch

and both officer witnessed Hensley point the firearm at Deputy Beasley. Further,

Lieutenant Price witnessed a physical altercation between Hensley and one of his daughters, during which Hensley struck his daughter on the back of the head at least once with his firearm. After attacking his daughter, Hensley briskly moved down the steps of the porch and through his yard with his firearm. While moving towards the officers, Hensley raised his firearm for a second time and pointed it at Deputy Beasley at which point the officers drew their weapons and shot Hensley.

Defendants retained and identified Chad Thompson as an expert witness. (*See generally*, Aff. of Chad Thompson). After reviewing the SBI investigative materials, Thompson opined that: In firing their weapons, Lieutenant Price and Deputy Beasley acted as Thompson would expect, and currently instruct, a reasonably trained law enforcement to act in such a circumstance; In firing their weapons, Lieutenant Price and Deputy Beasley conformed with North Carolina law on the use of deadly force, particularly N.C. Gen. Stat. § 15A-401(d)(2); In firing their weapons Lieutenant Price and Deputy Beasley conformed with federal case law governing the use of deadly force by a law enforcement officer. Additionally, after reviewing the deposition transcripts in this matter, Thompson's opinions regarding the deputies' use of force remained unchanged and, in fact, provided additional support for his opinions. *See* Thompson Aff. ¶ 5-6.

Defendants are not aware of any Fourth Circuit case where the Court has ruled that an officer who encounters a *gun pointed at him* is not allowed to defend

14

himself with deadly force. Even in cases with far less compelling facts, the Fourth Circuit has ruled in favor of the officers as a matter of law. In *Sigman v. Chapel Hill*, 161 F.3d 782, 786 (1998), for example, the Court affirmed summary judgment in favor of the officers where one of officers shot the plaintiff's son, Sigman, who was intoxicated, agitated, and threatening to kill himself. At the officers' insistence, Sigman exited his residence but did so with a knife. Based on the officers' perception that Sigman was holding the knife in a threatening manner, one of the officers shot and killed him. The Fourth Circuit ruled that a question of fact did not exist as to the reasonableness of the officers' perceptions despite evidence that Sigman was not armed or exhibiting threatening behavior at the time he was shot. *Sigman*, 161 F. 3d. at 788.

In *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991), the Court reversed the denial of the officers' summary judgment motion despite the fact that it was determined, after the plaintiff was shot in the face, that the plaintiff was not - as the officers believed armed with a weapon. The officer testified that he was not able to see the plaintiff's hands and it appeared to him that the plaintiff was coming toward him with a weapon. *Slattery*, 939 F.2d at 216.

Finally, In *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir. 1996), the Court again reversed the denial of the defendants' motion for summary judgment based on qualified immunity. In *Elliot,* the plaintiff's son had been arrested for driving

15

while intoxicated and after being handcuffed, he was placed in the back of the patrol car. While the officers were standing by the car, the officers perceived that plaintiff's son was pointing a gun at them from inside the car. When he refused to drop the gun, the officers fired *twenty-two shots* killing him. On appeal, the plaintiff argued that summary judgment should not be granted because there was some evidence that Elliott was not armed at the time of the shooting. The plaintiff also argued that Elliott did not constitute a threat because he was handcuffed in the back of a car and intoxicated. The Court rejected both arguments and ruled that a reasonable officer faced with the same circumstances would have concluded that a deadly threat existed.

In this case, as in the above noted cases, Defendants are entitled to prevail as a matter of law. Here, the Defendants were not mistaken in their belief that plaintiff was armed with a gun, Hensley actually did have a gun and the uncontroverted testimony is that - at the very least - the Deputies perception was that the gun was pointed at the Deputies at the time they used deadly force against Hensley. No evidence exists disputing the Defendants' testimony that they believed they were in danger, and, in fact, no evidence exists disputing the Defendants' testimony that Hensley was pointing the gun at them as he walked toward them from the porch. Based on these undisputed facts, no argument can be

16

made that Plaintiffs' rights were violated. Moreover, qualified immunity clearly applies and protects the defendants from liability under the facts of this case.

## II. PLAINTIFFS' § 1983 CLAIMS AGAINST THE DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE BARRED AS A MATTER OF LAW

The Supreme Court of the United States, as well as the courts of North Carolina, have specifically held that a plaintiff may not pursue a 42 U.S.C. § 1983 claim against an official in his official capacity if the plaintiff is seeking monetary damages, such as Plaintiffs are seeking in this case. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989); *Lee v. Greene*, 442 S.E.2d 547 (N.C. Ct. App. 1994).

To the extent Plaintiffs are seeking to assert § 1983 claims against the Haywood County Sheriff's Office as an entity, those claims are also insufficient as a matter of law. First, as discussed above, the undisputed facts demonstrate that plaintiffs suffered no constitutional violation. Further, The United States Supreme Court in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality may not be held liable pursuant to § 1983 based on the doctrine of respondeat superior. Instead, a local government and its officials may only be held liable when the municipality or its officials take action under and official policy which violates another individual's constitutional rights.

495372 v1

Plaintiffs have failed to forecast evidence of an official policy in any of the four enumerated ways set forth in *Monell* and its progeny. See also City of St. Louis v. Praprotnik, 485 U.S. 112 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

First, Lieutenant Price and Deputy Beasley used their discretion, relying on their training and experience, in order to determine what the situation required. (See generally Thompson Aff.) Clearly, this situation does not give rise to the existence of an official policy for liability purposes. In Pembaur, the Supreme Court specifically stated that the exercise of discretion in connection with a particular function does not "give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 482.

Plaintiffs have come forward with no evidence of a "custom" or "pattern" sufficient to establish the existence of an official policy. The only matter alleged in the Second Amended Complaint is the incident that gives rise to these claims. In Monell, the Supreme Court held that a custom may not arise out of a single incident. *Monell*, 436 U.S. at 691; See also, *Zwarton v. City of Chicago,* 625 F. Supp. 1211 (N.D. Ill. 1985) ("Plaintiffs have alleged on a single specific incident, namely their own, and that is not enough to establish a custom or policy.").

Finally, Plaintiffs cannot establish that the Haywood County Sheriff's Department failed to train and supervise its employees. In *City of Canton v.*

495372 v1

*Harris*, 490 U.S. 378, 389 (1978), the Supreme Court stated, "Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." Here, the record contains no evidence of inadequate training, let alone training which evinces a deliberate indifference to the inhabitants of Haywood County. The evidence shows that the Haywood County Sheriff's Department has appropriate use of force policies in place. (See Aff. of Greg Christopher, ¶ 4, Ex. B). Additionally, the, both Price and Beasley were properly trained  has been no other no other  claims for violations of constitutional rights brought against them. (Christopher Aff. ¶ 3, 5, Ex. A).

## III. PLAINTIFFS' CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION FAIL AS A MATTER OF LAW

Plaintiff's claims brought directly under the North Carolina Constitution are barred by the existence of adequate state remedies. It is well settled that a direct cause of action under the State Constitution is permitted only" in the absence of an adequate state remedy." *Corum v. University Of North Carolina*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). North Carolina courts have recognized that a common law claim of assault and battery, as well as wrongful death, provides an adequate state remedy which precludes a claim brought directly under the North

19

Carolina Constitution for excessive force against law enforcement officers. *See e.g., Edwards v. City of Concord*, 827 F. Supp. 2d 517, 524 (M.D.N.C. 2011) ("Edwards has alleged two intentional tort claims for false arrest and assault and battery, which the court finds serve to protect the same constitutional rights to be free from improper restraint and excessive force he seeks to vindicate with his alternative direct constitutional claim."); *Wilkerson v. Duke Univ.*, 748 S.E.2d 154, 159 (N.C. App. 2013) (holding that plaintiff's state constitutional claims were barred by the existence of an adequate state remedy, as they were based upon the same alleged conduct that underlied his state law claims for assault and battery and false imprisonment); *DeBaun v. Kuszaj*, 767 S.E.2d 353, 356 (N.C. App. 2014) *review denied*, 768 S.E.2d 853 (N.C. 2015) (holding that common law claims of assault and battery constituted adequate state remedies barring claims for excessive force brought directly under the North Carolina Constitution); *Olvera v. Edmundson*, 151 F.Supp.2d 700, 705 (N.C. App. 2001) (holding that wrongful death claim constituted adequate state remedies barring state constitution law claim).

As Plaintiffs' claim for assault and battery and wrongful death are based on the same facts as their claims directly under the North Carolina Constitution, their state constitutional claims are barred by the existence of an adequate state remedy. The fact that, as explained elsewhere, Plaintiffs cannot ultimately prevail on these

claims does not render then inadequate.  *See e.g., DeBaun v. Kuszaj*, 767 S.E.2d at 357 ("the fact that plaintiff must overcome the affirmative defense of public officer immunity to succeed on his tort claims does not negate their adequacy as a remedy.").

Moreover, assuming *arguendo* that Plaintiffs' state constitutional claims are not barred by the existence of an adequate state remedy, they are subject to dismissal as the use of force was reasonable under the circumstances, as set forth above.  The North Carolina Constitution is con-extensive with the Constitution of the United States on the issue of excessive force.  *Little v. Smith*, 114 F.Supp. 2d 437, 445 (W.D.N.C. 2000).

## IV.    PLAINTIFFS' CLAIMS FOR ASSAULT FAILS AS A MATTER OF LAW.

"[A] civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is *excessive* under the given circumstances." *Myrick v. Cooley*, 91 N.C.App. 209, 215, 371 S.E.2d 492, 496 (1988).  In order to succeed on the assault claim, Plaintiffs Rachelle Ferguson and H.H. must demonstrate that the Defendants used excessive force against them.   These Plaintiffs have not, and cannot, show that the Defendants used excessive force as N.C.G.S.A. §15A-401(b) affords law enforcement officers the right to use force to defend against "what he reasonably believes to be the use or imminent use of

21

physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape." When determining state constitutional use of force claims, North Carolina courts apply the standard of objective reasonableness. *See Jordan v. Civil Service Bd. for City of Charlotte*, 153 N.C.App. 691, 698, 570 S.E.2d 912, 917 (2002) (explaining that "[t]he question of '[w]hether an officer has used excessive force is judged by a standard of **objective reasonableness'**") (quoting *Clem v. Corbeau,* 284 F.3d 543, 550 (2002) (emphasis added)).

Just like the federal courts, N.C. courts have held that such an analysis requires "careful attention to the facts and circumstances of each particular case." *Jordan*, 153 N.C.App. at 698, 570 S.E.2d at 918 (quoting *Graham v. Connor,* 390 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989)). Therefore, for the reasons stated in **Section I**, *supra,* the Defendants' use of force was objectively reasonable under the circumstances. Moreover, the objective reasonableness of the actions are considered in terms of the situation as a whole (*i.e.* the Deputies being confronted with an imminent threat of force Hensley) and not on an individual basis. *See, e.g., Russ v. Causey*, 732 F.Supp.2d 589 (E.D.N.C. 2010) (granting summary related to claims for assault by relative of an arrestee who were bystanders when an officer presented a Taser in an attempt to control a crowd).

22

Accordingly, the Defendants are entitled to prevail as a matter of law as to the assault and battery claims against them and summary judgment should be granted.

## V. PLAINTIFFS' CLAIM FOR WRONGFUL DEATH IS INSUFFICIENT AS A MATTER OF LAW.

Public officials are generally immune from personal liability for negligence in the performance of their duties unless evidence demonstrates that they acted maliciously, corruptly, or outside the scope of their official authority. *Bishop v. Cty. of Macon*, ___ Fed. Appx. ___, 2015 WL 4126427, at *2 (4th Cir. July 9, 2015) (citing *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir.2003); *Wilcox v. City of Asheville*, 730 S.E.2d 226, 238 (N.C. Ct. App. 2012). Here, the Plaintiffs have presented no evidence demonstrating the Defendants acted maliciously, corruptly, or outside the scope of their official authority. Moreover, mere allegations of gross negligence cannot defeat immunity. *Bishop* at *2 (citing *Shaw v. Stroud*, 13 F.3d 791, 803 (4th Cir. 1994)). Accordingly, the Defendants are entitled to prevail as a matter of law as to the wrongful death claims against them and summary judgment should be granted.

## VI. Plaintiffs' claims for Negligent/Intentional Infliction of Emotional Distress fail as a matter of law.

"The elements for the tort of intentional infliction of emotional distress are: '1) extreme and outrageous conduct by the defendant 2) which is intended to cause and does in fact cause 3) severe emotional distress.'" *Smith-Price v. Charter*

23

*Behavioral Health Sys.*, 164 N.C. App. 349, 354, 595 S.E.2d 778, 782 (2004) (quoting *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992)). "Conduct is extreme and outrageous when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Briggs v. Rosenthal*, 73 N.C.App. 672, 677, 327 S.E.2d 308, 311, *cert. denied*, 314 N.C. 114, 332 S.E.2d 479 (1985)). "The determination of whether the alleged conduct is considered extreme and outrageous is a question of law for the trial judge." *Smith-Price v. Charter Behavioral Health Sys.*, 164 N.C. App. 349, 354, 595 S.E.2d 778, 783 (2004).

"An action for the negligent infliction of emotional distress has three elements: (1) defendant engaged in negligent conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress; and (3) defendant's conduct, in fact, caused plaintiff severe emotional distress." *Robblee v. Budd Servs., Inc.*, 136 N.C. App. 793, 795, 525 S.E.2d 847, 849 (2000) (citing *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97, reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990)).

Here, Plaintiffs have not presented any evidence to meet the of the elements of either claim. Most importantly, there is no evidence of extreme or outrageous conduct by the Defendants or - as explained above - evidence of negligent conduct,

24

because the officer's actions were objectively reasonable given their circumstances and their perception.

## VII. PLAINTIFFS' CLAIMS AGAINST DEFENDANTS THE OHIO CASUALTY INSURANCE COMPANY AND WEST AMERICAN INSURANCE COMPANY FAIL AS A MATTER OF LAW.

"Where 'plaintiff does not survive summary judgment on a common law tort claim, it follows that plaintiff's statutory bond claim must also fail.'" *Nance v. Ingram*, 2015 WL 5719590, at *8 (E.D.N.C. Sept. 29, 2015) (citing *Elliot v. Rollins*, 2013 WL 5460193, at * 2 (E.D.N.C. Sept. 30, 2013)).  For the reasons described above, Plaintiffs have failed to produce evidence sufficient to support a tort claim against the Defendants. Therefore, Plaintiffs' claim against the sheriff's bonds must fail and the Defendants are entitled to summary judgment as a matter of law.

## VIII. PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES FAIL AS A MATTER OF LAW.

For all of the reasons set forth above, Defendants clearly did not engage in willful, wanton, or grossly negligent conduct.  Moreover, to the extent that Plaintiffs seek punitive damages pursuant to § 1983, such claims are not allowed against municipalities.  *See Newport v. Fact Concerts, Inc*., 453 U.S. 247 (1981).

25

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that their Motion for Summary Judgment be GRANTED, and that Plaintiffs' claims against them be DISMISSED WITH PREJUDICE.


This the 1st day of December, 2015.

/s/ Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER & HARTZOG, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
pflanagan@cshlaw.com

26

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Memorandum of Law** was filed electronically. Notice of filing will be sent to the following persons by operation of the Court's electronic filing and notification system:

RUSSELL L. MCLEAN, III
Rlmclean3@aol.com

This the 1st day of December, 2015.

/s/ Patrick H. Flanagan
N.C. Bar No. 17407
CRANFILL SUMNER & HARTZOG, LLP
P.O. Box 30787
Charlotte, NC 28230
Telephone: (704) 332-8300
Facsimile: (704) 332-9994
pflanagan@cshlaw.com

495372 v1