# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:14-cv-00193-MR-DLH

|  |  |  |
|---|---|---|
| TERESA ANN HENSLEY, Administrator of the Estate of David Lee Hensley, H.H., a minor, by and through her parent and next friend, THERESA ANN HENSLEY as General Guardian, RACHELLE FERGUSON, Individually, STATE OF NORTH CAROLINA EX REL., Estate of David Lee Hensley, H.H., and Rachelle Ferguson, | ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| vs. | ) ) | |
| BOBBY R. SUTTLES, individually and in his official capacity as former Sheriff of Haywood County, LARRY BRYSON, individually and in his official capacity as Deputy of the Haywood County Sheriff's Department, DAVID MITCHELL, individually and in his official capacity as Patrol Captain of the Haywood County Sheriff's Department, MICHAEL SCOTT PRICE, individually and in his official capacity as Lieutenant of the Haywood County Sheriff's Department, KEITH ALLEN BEASLEY, individually and in his official capacity as Deputy Sheriff of the Haywood County Sheriff's Department, THE OHIO CASUALTY INSURANCE COMPANY, and WEST AMERICAN INSURANCE COMPANY, Corporate sureties on the official bond of the Sheriff of Haywood County, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

## PROCEDURAL BACKGROUND

This is an excessive force case arising from two law enforcement officers shooting and killing David Lee Hensley in his front yard. Plaintiffs bring this action, asserting eight claims for relief in their Second Amended Complaint as follows: (1) violations of 42 U.S.C. § 1983 [Doc. 26 at 9 to 12]; (2) violations of North Carolina Constitutional rights [Id. at 12 to 13]; (3) assault [Id. at 13]; (4) negligent infliction of emotional distress and (5) intentional infliction of emotional distress [Id. at 13 to 14]; (6) wrongful death [Id. at 15]; (7) a claim against the sureties for Haywood County and the Sheriff's office [Id. at 16]; and (8) punitive damages. [Id. at 17].

The Defendants, collectively, filed an Answer to Plaintiffs' Second Amended Complaint raising various affirmative defenses and generally denying the material factual allegations. [Doc. 29]. The Defendants, collectively, have filed a motion for summary judgment on all of the Plaintiffs' claims. [Doc. 39]. The Plaintiffs have responded thereto. [Doc. 47].

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d

2

570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. Adams. v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## FACTUAL BACKGROUND

The central question underlying Defendants' motion is whether the named officers are entitled to qualified immunity for their actions. Analyzing the applicability of qualified immunity in the context of the claiming officers' summary judgment motion is a two-step process. First, the Court must

determine the factual scenario, that is the facts taken in the light most favorable to the Plaintiffs based upon the forecasts of evidence presented. Second, in a case where a plaintiff alleges that a police officer has unconstitutionally used deadly force, the officer's actions are judged on a standard of objective reasonableness. Thus, the Court must apply that objective standard to the factual scenario properly determined and consider whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If a reasonable jury could so find, summary judgment must be denied.

The forecasts of evidence presented by the Plaintiffs and by the Defendants are remarkably in conflict with one another regarding the facts surrounding the critical issue of qualified immunity. Proceeding with a view of the evidence in the manner as described above, however, the evidence would allow a rational jury to find that the following events occurred.

At 6:18 a.m. on August 9, 2012, Lt. Michael Price and Deputy Keith Beasley of the Haywood County Sheriff's Department, received a call over the radio regarding a civil disturbance at the home of David Lee Hensley ("Hensley"), the decedent in this matter. [Doc. 47-8 at 3 to 4]. They traveled in separate patrol cars to the scene arriving about 6:36 a.m. [Id. at 4]. Hensley was inside the home with his daughters Rachelle Ferguson and

minor daughter H.H. [Doc. 47-4 at 2].  Rachelle was with her father in the kitchen. [Doc. 40-3 at 10 to 11]. H.H. was dressing and getting ready for school.  [Doc. 47-4 at 4]. Decedent's wife, Teresa Hensley, was away from the home at the time, working the third shift at the Haywood County Hospital. [Doc. 47-7 at 4]. Mrs. Hensley was, however, expected back home at any moment and the decedent would look out the front windows of the home periodically anticipating her arrival. [Doc. 47-2 at 4]. When the deputies drove up in their vehicles, the decedent looked out the front windows.  [Id.]. Decedent saw the police cars and then walked from the front room of the house into his bedroom followed by Rachelle.  [46-1 at 2]. H.H. was already in decedent's bedroom.  [Doc. 46-2 at 2].

Both daughters testified that they watched their father retrieve something from underneath the mattress of the bed.  [Doc. 46-1 at 2; Doc. 46-2 at 2]. Rachelle did not know what her father was digging for until he came out with the keys to his gun safe.  [Doc. 47-2 at 4]. Decedent then walked over to the "shoe box" sized gun safe located under the television [Doc. 47-2 at 4] and removed a pistol. [Doc. 40-3 at 13; Doc. 46-2 at 3]. Rachelle and H.H. tried to grab the pistol from their father's hand but were unsuccessful. [Doc. 40-3 at 13; Doc. 40-5 at 5].  Hensley and his two daughters then left the bedroom and made their way to the front porch of the

home. [Id.]. When they arrived on the porch, the two girls saw the deputies' vehicles, one parked in front of the other, in the driveway facing the house. [Doc. 40-3 at 16]. Rachelle was standing in front of her father on the porch, H.H. was standing to the side of her father and sister, and all three were facing forward looking off the porch in the direction of the deputies' cars. [Doc. 40-3 at 17; Doc. 46-2 at 5 to 6]. Rachelle described the two deputies as just sitting in their patrol cars. [Doc. 47-2 at 4]. On the porch, the decedent began striking Rachelle in the back of the head with the butt of the pistol which he held in his right hand. [Doc. 40-3 at 17; Doc. 40-5 at 7]. At this point, H.H. attempted to push her father's right arm, which held the gun, away from Rachelle [Doc. 40-5 at 8 to 9] while Rachelle began screaming for the officers to come help her. [Id.; Doc. 40-3 at 19]. Despite Rachelle's calls for help, H.H. stated the deputies "just sat there." [Doc. 47-4 at 2].

The decedent then left the porch and walked down the front steps. [Doc. 40-3 at 19; Doc. 40-5 at 9]. H.H. observed the decedent walk down the steps of the porch with the gun in his right hand. [Doc. 47-4 at 3]. According to H.H., the decedent held the gun by his side and not pointed at anyone and, she stated, her father was "not acting aggressive." [Id.]. From the bottom of the stairs, the decedent walked a short distance on the walkway that was parallel to the front of the house and then veered off the walkway at

a right angle walking into the front yard in the direction of the deputies' cars. [Doc. 46-1 at 3; Doc. 46-2 at 9]. H.H. testified that as the decedent walked across the yard, the pistol was no longer in his right hand. [Doc. 46-2 at 9]. She stated that, due to the angle at which the decedent walked across the yard, she could not see the gun in his left hand but she further stated that both of decedent's arms were down by his sides. [Doc. 47-3 at 2]. At one point, the decedent turned his head toward H.H. and mouthed the words "I love you" and then turned his head back to face the deputies. [Doc. 46-2 at 10]. H.H. testified the deputies began firing upon her father, shooting him in the head, as soon as he turned back to face them. [Id.]. "At no time," according to H.H., "did my father raise either arm and point a gun towards anybody, including the police officers." [Doc. 47-3 at 2; Doc. 46-2 at 17 to 18].

Rachelle testified in a similar manner. [Doc. 47-1 at 2]. She described her father walking off the porch and down the stairs at a normal pace. [Id.]. According to Rachelle, he had the gun by his side and did not say anything while he kept both arms down. [Id.]. She testified that "[a]t no time did I ever see him raise his arms or his hands from his side." [Id.]. As he got close to the first deputy's car, Rachelle stated the car door opened and both deputies starting shooting without telling him to drop to the ground, or put the gun

down, or any other verbal command. [Id.]. The deputies shot Hensley in the head causing a portion of his brain and parts of his skull to splatter into the yard and remain there for some time. [Doc. 46-1 at 8]. According to Rachelle, "you could see what happened. We could see what happened for months. There was blood all in the yard, hair." [Id. at 11].

Both officers conceded that neither of them issued any verbal commands to the decedent before shooting him. [Doc. 46-3 at 15; Doc. 46-5 at 2]. When Lt. Price was asked why he issued no verbal commands, he testified, "for one reason, it was happening so fast. And the other reason, at that time I couldn't say nothing. … I guess you could say your sensories. I mean, I could not physically at that time say anything. I couldn't." [Doc. 46-5 at 2].

As described by both Rachelle and H.H., after the decedent was struck in the head and killed by the deputies' gunfire, the deputies continued to fire. Both women testified that they could feel the "force" of bullets flying past them. [Doc. 46-1 at 10; 46-2 at 12]. H.H. stated that the bullets were "[c]lose enough to where I thought that I was going to get hit." [Doc. 46-2 at 11]. Rachelle testified that she could feel a bullet or bullets go past her leg and strike the exercise machine behind her on the porch. [Doc. 46-1 at 5].

Both daughters testified that watching their father being shot and killed in front of them was horrifying. [Doc. 40-5 at 13; Doc. 46-1 at 7 to 8]. H.H. stated that she has not seen a doctor, psychologist, or counselor since the incident. [Doc. 40-5 at 13]. She testified, however, that "I feel like no one – Even if you have lost your dad, you still can't relate to how I lost him. You know, nothing is more traumatic than seeing someone getting their brains blown out in front of you." [Id.]. Rachelle ultimately sought treatment, has been diagnosed with PTSD, and has been prescribed medication. [Doc. 46-1 at 8]. Rachelle did not seek treatment immediately following the killing of her father, however, for reasons similar to those given by her sister:

> For the longest time I – I haven't seeked any help for the simple fact I don't feel that no one can understand me. And I know that that is bad. But unless you have seen someone you love, their brains blew out and shot, it is very hard for me to think that you can understand or even lead me in the right direction, even though they are experts.

[Doc. 46-1 at 8].

Contrary to the testimony of the decedent's two daughters, Price and Beasley testified that the decedent – with both of his arms extended in front of him – pointed his pistol at deputy Beasley on two separate occasions. The first time the decedent allegedly threatened Beasley, the decedent appeared on the front porch of his home alone. [Doc. 40-2 at 8; Doc. 40-6 at 4 to 5]. Both of the decedent's daughters dispute that this event even occurred.

[Doc. 47-1 at 2; Doc. 47-3 at 2]. The second time occurred when the decedent left his front porch. Price testified that once the decedent reached the bottom of the stairs, he briskly began to walk across the yard with both arms extended in front of him holding the pistol and directly aiming the gun at Beasley's car. [Doc. 46-5 at 4 to 7]. Further, Price testified that the decedent appeared to be using one of his hands in a flagging manner over the top of the gun as if trying to cock the hammer back. [Id. at 5]. At this point, Price began shooting. [Id. at 7]. Beasley testified that when the decedent left the steps, the decedent pointed the pistol at Beasley with his right hand and began "trying to fan the hammer" with his left hand. [Doc. 46-3 at 19]. According to Beasley, "[a]t that point I started firing, yes." [Id.]. This scenario, however, is entirely contradicted by the forecast presented by the Plaintiffs, and therefore is of little relevance to determining the factual scenario to be examined for summary judgment.

## DISCUSSION

I. Plaintiffs' Concession of Certain Claims.

Prior to and at the summary judgment hearing held February 16, 2016, Plaintiffs abandoned several of their claims. In their Response to the Defendants' summary judgment motion, Plaintiffs did not oppose Defendants' motion as to their Second Cause of Action asserting violations

of the decedent's rights pursuant to the North Carolina Constitution. [Doc. 46 at 19]. Similarly, during the summary judgment hearing, Plaintiffs conceded that all claims alleged against Defendants Suttles, Bryson, and Mitchell in their official capacities were foreclosed. Finally, Plaintiffs acknowledged that their 42 U.S.C. § 1983 "policy and practices" claims alleged against Defendants Suttles, Bryson, and Mitchell in their individual capacities were infirm as a matter of law. For these reasons, the Defendants' motions for summary judgment as to those claims will be granted.

The Plaintiffs' claims remaining for the Court to resolve, therefore, are their claims against Deputy Beasley and Lt. Price, in their individual and official capacities, pursuant to the First, Third, Fourth, Fifth, Sixth, and Eighth Causes of Action of the Plaintiffs' Second Amended Complaint. The viability of Plaintiffs' Seventh Cause of Action against the insurance company Defendants is dependent upon the Court's resolution of Plaintiffs' tort claims asserted against Beasley and Price.

II. Plaintiffs' § 1983 Claims against Price and Beasley.

Plaintiffs' First Cause of Action, asserted under § 1983, alleges that Defendants Price and Beasley violated decedent's constitutional rights by unjustifiably employing deadly force against him. In response, these

Defendants claim they are entitled to summary judgment based on qualified immunity.

> Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.

Pearson v. Callahan, 555 U.S. 223, 231 (2009). Accordingly, qualified immunity protects police officers from liability for "bad guesses in gray areas" but permits aggrieved parties to seek damages from them when they "transgress[ ] bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Therefore, taking the evidence in the light most favorable to the Plaintiffs, the Court must determine two issues: (1) did the Defendants violate the decedent's constitutional rights, and (2) was the Defendants' alleged harmful conduct clearly established to be unconstitutional at the time. Pearson, 555 U.S. at 227. If either one of these issues is answered in the negative, Defendants enjoy qualified immunity and Plaintiffs' § 1983 action must be dismissed.

The Plaintiffs asserts that the Defendants' alleged harmful conduct – Price and Beasley's unreasonable use of deadly force to "seize" the decedent – was conduct clearly proscribed by the Constitution. While a police officer's interaction with a person may or may not ultimately lead to

the person's seizure in a constitutional sense, "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985).   Therefore, if the forecast of evidence would support a jury finding that the deputies' use of deadly force was unreasonable, then both prongs of the pertinent test have been met: (1) the decedent's constitutional rights were violated and (2) the deputies' actions were clearly established to have been unconstitutional as shown by Supreme Court precedent predating the shooting by more than two decades.

A citizen's claim that law enforcement officials used excessive force in the course of making a "seizure" of his person are properly analyzed under the Fourth Amendment's "objective reasonableness" standard.   Graham v. Conner, 490 U.S. 386, 388 (1989); Sigman v. Town of Chapel Hill, 161 F.3d 782, 786 (4th Cir. 1998).  According to the Supreme Court,

> we make explicit what was implicit in Garner's analysis, and hold that *all* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

Graham, 490 U.S. at 395.   The use of deadly force by a police officer is reasonable when the officer has "probable cause" to believe that a person poses a threat of serious physical harm to the officer or to others.  Garner,

471 U.S. at 11. Thus, where the person poses no immediate threat, the use of deadly force is not justified. In the end, objective reasonableness of the officer's probable cause determination is the touchstone. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Graham, 490 U.S. at 397.

With these principles in mind, the legal question is whether Plaintiffs' forecast of evidence can give rise to a reasonable inference that the deputies objectively lacked probable cause to believe that the decedent posed a threat of serious physical harm to them. Taking the evidence in the light most favorable to the Plaintiffs, as set forth above, a reasonable jury could conclude that the officers had no objective basis upon which they could base a decision to use deadly force against the decedent. According to the Plaintiffs' testimony, the decedent had both arms down by his sides and thus was not holding or pointing the firearm in any threatening manner. The fact that the Defendants' forecast is starkly different is of no moment at this stage.[1]

_____

[1] At the summary judgment hearing, the Defendants offered, for the first time, a completely different factual scenario. The Defendants argued the decedent, while walking into the yard, could have pointed the pistol at Beasley while his arms were down at his

Defendants argue that, even taking Plaintiffs' evidence as true that the gun was at the decedent's side and not pointing at Beasley, the Defendants are still entitled to summary judgment because the "totality of the circumstances" would allow a "reasonable officer" in the heat of the moment to conclude that the decedent was an immediate threat to the life or safety of the officer or others, thus justifying the use of deadly force. In support of this argument, Defendants assert that they were responding to a "civil disturbance" call at the decedent's home, they observed a physical altercation between the decedent and his daughter Rachelle, and the decedent was visibly armed with a pistol. The sum total of these facts, according to the Defendants, add up to an imminent threat of death or serious bodily harm, and the deputies' actions in response thereto cloak them with qualified immunity. The Defendants rely heavily on the Fourth Circuit's decision in Sigman v. Chapel Hill. [Doc. 40 at 15; Doc. 49 at 2-4, 7].

In Sigman, it was undisputed that Mr. Sigman possessed a knife prior to leaving his house. He slashed at officer Riddle through a broken window with a knife and told the officer, "I'm going to kill you." Sigman, 161 F.3d at

_____

side in some sort of "shoot from the hip" posture. There is, however, absolutely no evidence from which a jury could find such to be the truth.

784.  It was likewise undisputed that before Sigman emerged from his house

he explicitly threatened the officers with harm telling them something to the

effect of, "If you want me, come in and get me.  But you're going to get hurt."

Id. at 785.  Further, Riddle had been made aware that Sigman was enraged

inside the house, cutting himself. He knew that Sigman had been drinking

and throwing things. He knew that Sigman was willing to use his knife on

others because Sigman had slashed at him through the window. He knew

that Sigman had made threats on his life, on his fellow officers' lives, and on

his girlfriend's life. And he knew that Sigman had not previously responded

to his requests to calm down or come out of the house. Furthermore, when

Sigman emerged from the house, he did not obey the officers' commands.

Rather, he took a number of steps towards Riddle. Id. at 787.  There was,

however, conflicting evidence as to whether Sigman still possessed the knife

when he stepped toward Riddle. Witnesses some distance away testified

that Sigman had no knife, but it was dark and the light was poor.

Significantly, however, Riddle testified he believed that Sigman continued to

possess the knife, and being in immediate apprehension of bodily harm, shot

Sigman. The court held that the issue of whether Sigman actually possessed

a knife at the time he was shot was only one factor the officers had to assess

at the scene.  The other uncontested facts together with Riddle's perception

that Sigman still held the knife was sufficient to provide Riddle with ample basis for assessing Sigman's dangerousness such that deadly force could be used.

Defendants' reliance on Sigman is misplaced. In the present matter, it was daylight when the Hensley family members walked onto the porch, unlike the darkness of night that shrouded the events occurring in Sigman. Further, it was clearly visible to all – and all parties agree – that the decedent had the gun pointed downward as he was leaving the porch and walking down the stairs.  If the decedent did not point his gun at Beasley as he made his way across the front yard, as Plaintiffs' forecast of evidence shows, then no reasonable officer could have objectively concluded that the decedent was a danger to the deputies' lives or safety warranting the use of deadly force.  Cf. United States v. Robinson, --- F.3d ----, No 14-4902, 2016 WL 714968 at *5 (4th Cir. 2016) (concluding that in states which broadly allow public possession of firearms, reasonable suspicion that a person is armed does not by itself give rise to a reasonable suspicion that the person is also dangerous).

The Court is aware that the Defendants vigorously dispute the Plaintiffs' forecast of evidence as discussed throughout this opinion.  That, however, only serves to emphasize the point.  It is the duty of this Court to

discern from the competing forecasts of evidence the factual scenario that takes the evidence in the light most favorable to the non-moving party, even if contrary evidence is present. If the jury believes Plaintiffs' forecast of evidence – looking at that evidence from the perspective of the "reasonable officer on the scene" – it was objectively unreasonable for Beasley and Price to use deadly force against a person who was holding his pistol down by his side and was visibly not presenting himself as a threat of immediate harm to the officers or to anyone else. Therefore, both prongs of the qualified immunity analysis are satisfied by Plaintiffs' forecast of evidence: (1) Defendants' violated decedent's constitutional rights when they unlawfully seized (i.e. killed) him through the use of excessive force, and (2) it was clearly established at the time that the deputies could not seize the decedent in the manner in which they did. For these reasons, the Defendants' Motion for Summary Judgment regarding Plaintiffs' § 1983 claim must be denied.

III.   Plaintiffs' Assault Claim.

Plaintiffs' Third Cause of Action alleges Beasley and Price assaulted Rachelle and H.H. [Doc. 26 at 13]. North Carolina looks to the common law for the definition of the intentional tort of assault.

> North Carolina follows common law principles governing assault and battery. An assault is an offer to show violence to another without striking him, and a battery is the carrying of the threat into effect by the infliction of a blow. The interest protected by the

18

action for battery is freedom from intentional and unpermitted contact with one's person; the interest protected by the action for assault is freedom from apprehension of a harmful or offensive contact with one's person.

Dickens v. Puryear, 302 N.C. 437, 445, 276 S.E.2d 325, 330 (1981). The elements of assault, therefore, are: (1) intent, (2) offer of injury, (3) reasonable apprehension, (4) apparent ability, and (5) imminent threat of injury. Hawkins v. Hawkins, 101 N.C. App. 529, 533, 400 S.E.2d 472, 475 (1991) aff'd, 331 N.C. 743, 417 S.E.2d 447 (1992).

In this claim, Plaintiffs assert that Price and Beasley assaulted Rachelle and H.H. by the deputies' shooting "in the direction of the Plaintiffs" on the porch, thus constituting a threat of imminent bodily harm to them. [Doc. 26 at 13]. It is noted that the decedent, and not Rachelle or H.H., was the intentional target of the deputies' shots and therefore the intended victim of their assault. North Carolina, however, recognizes the common law doctrine of transferred intent in civil assault actions. Holloway v. Wachovia Bank & Trust Co., 109 N.C. App. 403, 428 S.E.2d 453 (1993), aff'm in part, rev'd in part on other grounds, 339 N.C. 338, 452 S.E.2d 233 (1994). "If an act is done with the intention of affecting a third person ... but puts another in apprehension of a harmful or offensive contact, the actor is subject to liability to such other as fully as though he intended so to affect him."

Holloway, 109 N.C. App. at 417, 428 S.E.2d at 461 (quoting with approval the Restatement (Second) of Torts § 32(2). (1965)).

The evidence is undisputed that Beasley and Price intended to shoot the decedent. Both Rachelle and H.H. testified that they were placed in imminent fear of being struck by those bullets fired by the deputies that missed the decedent. Both Rachelle and H.H. testified that they could feel the wake of air currents caused by the deputies' bullets passing close to their bodies and that they were in imminent fear of being struck. If the Defendants' conduct against the decedent is actionable, then their intent to shoot the decedent would likewise support a claim of assault by the decedent's daughters under the doctrine of transferred intent.

In response to Plaintiffs' assault claim, Defendants reiterate their arguments in favor of qualified immunity and contend no assault occurred because "the Defendants' use of force was objectively reasonable under the circumstances." [Doc. 40 at 22]. While a civil action for assault is available under North Carolina law against one who uses force for the accomplishment of a legitimate purpose such as justifiable arrest, the use of such force under the given circumstances must be excessive for the claimant to prevail. Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988). "The question of '[w]hether an officer has used excessive force is judged by a

standard of objective reasonableness.' " <u>Jordan v. Civil Service Bd.</u>, 153 N.C. App. 691, 698, 570 S.E.2d 912, 918 (2002) quoting <u>Clem v. Corbeau</u>, 284 F.3d 543, 550 (4th Cir. 2002). The Defendants' argument, therefore, is resolved by the Court's previous determination that the Defendants are not entitled to summary judgment based on qualified immunity.  If the deputies' actions toward the decedent were immunized, that immunity would negate the element of intent required for an assault claim, and any transferred intent necessarily would be absent as well.  Put another way, the viability of Plaintiffs' assault claim is tied to the objective reasonableness of the Defendants firing their weapons upon the decedent.

As previously noted in the Court's discussion of the deputies' seizure of the decedent, the facts taken in a light most favorable to Plaintiffs would tend to show the deputies' conduct in this regard was not objectively reasonable. Therefore, the Plaintiffs' forecast of evidence presents genuine issues of material fact as to whether they were assaulted by Beasley and Price.  For these reasons, the Motion for Summary Judgment of Defendants Beasley and Price on this claim is denied.

IV.   <u>Plaintiffs' Negligent Infliction of Emotional Distress, Wrongful Death, and Punitive Damages Claims</u>.

Pursuant to their fourth claim, Plaintiffs allege Beasley and Price negligently inflicted emotional distress upon Rachelle and H.H.  [Doc. 26 at

13 to 14].   Pursuant to their sixth claim, Plaintiffs allege that "the grossly negligent, malicious and/or willful actions" of Beasley and Price led to the wrongful death of the decedent.  [Id. at 15].  In their Eighth Cause of Action, Plaintiffs assert that the "acts of Defendants Price and Beasley were done with actual malice and/or were done in gross, willful, wanton, and reckless violation of the laws of the State of North Carolina and the United States" and thus entitle the Plaintiffs to punitive damages. [Id. at 17].

A.    Negligent Infliction of Emotional Distress.

In an action for the negligent infliction of emotional distress ("NIED"), a plaintiff must prove (1) the defendant engaged in negligent conduct, (2) reasonably foreseeable to cause the plaintiff severe emotional distress, (3) which, in fact, caused plaintiff severe emotional distress.  Sorrells v. M.Y.B. Hospitality Ventures, 334 N.C. 669, 672, 435 S.E.2d 320, 321-22 (1993).  A jury could find, based upon Plaintiffs' forecast of evidence, that the deputies' shooting the decedent in the head was a negligent act.   Further, the undisputed evidence shows that the deputies were fully aware of the close proximity of Rachelle and H.H. to their father when they fired upon and killed him in their presence. A jury could therefore conclude that is was reasonably foreseeable to the deputies' that severe emotional distress to Rachelle and

H.H. would follow from the deputies' negligence, the daughters having witnessed "someone you love, their brains blew out and shot[.]"

Defendants contend that they are entitled to public official immunity as to Plaintiffs' state law claims.[2]  Under the North Carolina doctrine of public official immunity:

> The general rule is that a public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties.

Slade v. Vernon, 110 N.C. App. 422, 428, 429 S.E.2d 744, 747 (1993).  "An officer acts with malice when he does that which [an officer] of reasonable intelligence would know to be contrary to his duty, i.e., when he violates a clearly established right." Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (citation and internal quotation marks omitted).  Therefore, the Plaintiffs having presented a forecast of evidence from which a jury could

---

[2] In their summary judgment opening brief, the Defendants make no arguments beyond public official immunity/qualified immunity. Therein, Defendants summarily assert the Plaintiffs have not presented any evidence to meet the elements of this claim nor have they presented any evidence to meet the elements of their intentional infliction of emotional distress claim.  [Doc. 40 at 24].  Defendants raise the argument for the first time in their reply brief that Plaintiffs have failed to forecast any evidence of the "severe emotional distress" element to support either of their intentional or negligent infliction of emotional distress claims.  First, it should be noted that Plaintiffs have forecast evidence that Rachelle has been diagnosed with PTSD. More importantly, however, Defendants have waived the argument for purposes of summary judgment by not making it a basis for their motion for summary judgment as set out in their opening brief.  See, e.g., Peterson v. Vill. of Downers Grove, 103 F.Supp.3d 918, 925 (N.D. Ill. 2015).

determine that Defendants Beasley and Price violated a clearly established right and acted contrary to their duty, they have presented a forecast proving malice as defined under state law. Defendants are therefore not entitled to summary judgment based on public official immunity as to Plaintiffs' NIED claim.

B.    Wrongful Death.

In an action under N.C. Gen. Stat. § 28A-18-2 (the wrongful death statute), a plaintiff must prove (1) a wrongful act resulting in death, (2) causation, and (3) damages. Bailey v. Gitt, 135 N.C. App. 119, 120, 518 S.E.2d 794, 795 (1999). Negligence is a "wrongful act" upon which a wrongful death claim may be predicated. Id. Accepting the forecast of evidence in the light most favorable to the Plaintiffs, a jury could find that the deputies' killing of the decedent under the circumstances then present constituted actionable negligence on their part. Further, Plaintiffs' explicitly pled that Hensley's death "was caused by the grossly negligent, malicious and/or willful actions of Defendants Price and Beasley[.]" [Doc. 26 at 15].

Like the Defendants' arguments made in an effort to defeat Plaintiffs' NIED claim, Defendants argue summary judgment in their favor is appropriate as to Plaintiffs' wrongful death claim because, as public officials,

they are generally immune from personal liability for negligence in the performance of their duties. [Doc. 40 at 23].

Accepting the forecast of evidence in the light most favorable to the Plaintiffs, the deputies killed decedent using unconstitutionally excessive force. Regardless of whether the Plaintiffs' claim for wrongful death is grounded in negligence, gross negligence, malice or something else, Plaintiffs have presented a forecast of evidence that is sufficient for a jury to find a basis for liability. Further, because the deputies' acts at issue violated the decedent's clearly established rights, an officer of reasonable intelligence would have known that the manner in which those acts were carried out was contrary to his duty as well. Accordingly, Plaintiffs have forecast sufficient evidence to foreclose summary judgment based on the doctrine of public official immunity. Defendants are therefore not entitled to summary judgment based on public official immunity as to Plaintiffs' wrongful death claim.

C.    Punitive Damages.

Plaintiffs assert they are entitled to punitive damages because the "acts of Defendants Price and Beasley were done with actual malice and/or were done in gross, willful, wanton, and reckless violation of the law[.]" [Doc. 26 at 17]. Defendants summarily assert that they "did not engage in willful, wanton, or grossly negligent conduct." [Doc. 40 at 25]. For the reasons

stated above, several of the Plaintiffs' tort claims survive summary judgment based upon a forecast of evidence tending to show malice or willful, wanton, or grossly negligent conduct. Plaintiffs' punitive damages claim survives to the same extent. The Defendants' motion for summary judgment on Plaintiffs' punitive damages claims, therefore, should be denied.

V.     Plaintiffs' Intentional Infliction of Emotional Distress Claim.

In their fifth claim, Plaintiffs allege Beasley and Price intentionally inflicted emotional distress upon Rachelle and H.H. [Doc. 26 at 14]. The essential elements of a claim for intentional infliction of emotional distress ("IIED") are: (1) extreme and outrageous conduct by the defendant, (2) which is intended to and did in fact cause (3) severe emotional distress. Dickens, 302 N.C. at 452, 276 S.E.2d at 335. Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354, 595 S.E.2d 778, 783 (2004) (internal quotation and citation omitted). The threshold determination of whether the alleged conduct may be considered extreme and outrageous is a question of law for the trial judge. Id.

One of the leading cases in North Carolina on the issue of what constitutes extreme and outrageous conduct is the North Carolina Supreme Court's decision in <u>Dickens</u> cited above.  Mr. Dickens, a thirty-one year old man, was engaged in an inappropriate relationship with the seventeen-year-old daughter of the defendants, Mr. and Mrs. Puryear.  <u>Dickens</u>, 302 N.C. at 439, 276 S.E.2d at 327.  Upon learning of this relationship, Mr. Puryear lured plaintiff into rural Johnston County, North Carolina.  Once there, Mr. Puryear

> pointed a pistol between plaintiff's eyes and shouted "Ya'll come on out." Four men wearing ski masks and armed with nightsticks then approached from behind plaintiff and beat him into semi-consciousness. They handcuffed plaintiff to a piece of farm machinery and resumed striking him with nightsticks. Defendant Earl Puryear, while brandishing a knife and cutting plaintiff's hair, threatened plaintiff with castration. During four or five interruptions of the beatings defendant Earl Puryear and the others, within plaintiff's hearing, discussed and took votes on whether plaintiff should be killed or castrated. Finally, after some two hours and the conclusion of a final conference, the beatings ceased. Defendant Earl Puryear told plaintiff to go home, pull his telephone off the wall, pack his clothes, and leave the state of North Carolina; otherwise he would be killed. Plaintiff was then set free.

<u>Id.</u>, 302 N.C. at 439-40, 276 S.E.2d at 327 (footnote omitted). The court concluded that the factual showing on the motions for summary judgment was sufficient to indicate that Dickens may be able to prove at trial a claim for intentional infliction of emotional distress and denied Mr. Puryear's motion in that regard.  <u>Id.</u> at 455, 276 S.E.2d at 337.

The facts recounted in <u>Dickens</u> exemplify the atrocious and utterly intolerable acts necessary to satisfy the "extreme and outrageous" conduct element of an IIED claim. <u>See</u> <u>also</u>, <u>Watson v. Dixon,</u> 130 N.C. App. 47, 53, 502 S.E.2d 15, 20 (1998), <u>aff'd</u>, 352 N.C. 343, 532 S.E.2d 175 (2000) (extreme and outrageous behavior found where defendant frightened and humiliated plaintiff with cruel practical jokes, made obscene comments to her, made indecent physical suggestions and threatened her personal safety); <u>McLain v. Taco Bell Corp.</u>, 137 N.C. App. 179, 527 S.E.2d 712, <u>disc</u>. <u>review</u> <u>denied</u>, 352 N.C. 357, 544 S.E.2d 563 (2000) (extreme and outrageous behavior found where defendant's employee, after physically assaulting plaintiff, began masturbating and ejaculated upon plaintiff). As such, "extreme and outrageous conduct" consists of something that is more egregious than malice which would support a claim of punitive damages or would overcome Defendants' claims of public official immunity.

Plaintiffs' forecast of evidence in this case tends to show that the deputies used excessive force in fatally shooting the decedent. Defendants argue that, even assuming Plaintiffs' evidence to be true, summary judgment should be granted because those facts do not satisfy the "extreme and outrageous conduct" element as a matter of law. [Doc. 40 at 24]. Witnessing the death of a parent brought about by law enforcement officers shooting him

in the head at close range is certainly extreme in the ordinary sense of the word.  Few, if any, events could be viewed as more extreme.  The "extreme and outrageous conduct" test, however, is not met simply by considering the brutality of the actions perpetrated by a defendant. The test must also include an assessment of the severity of distress the defendant intended to instill in the victim by way of such actions.  Regarding this test, <u>Dickens</u> is instructive.

As recounted in the above-quote passage from <u>Dickens</u>, between the beatings administered to Dickens, Puryear purposefully discussed – within Dickens' hearing – whether Dickens should be killed or castrated.  This was not idle talk but a premeditated tactic specifically employed by Puryear to induce terror in Dickens.  The import of the North Carolina Supreme Court's discussion of this evidence was to explain how inextricably intertwined the "extreme and outrageous conduct" element is with defendant's intent to inflict severe emotional distress. In other words, conduct is deemed "outrageous" when a defendant intends, knows, or deliberately disregards the high degree of probability that his "extreme" threats and actions will strike fear and anguish into the heart of the victim.  <u>Dickens</u>, 302 N.C. at 449, 276 S.E.2d at 333.   Puryear's actions satisfied the "extreme and outrageous conduct" element not because of the beatings ordered by him.  Those assaults and batteries, however, were "considered in determining the outrageous

character *of the ultimate threat* and the extent of plaintiff's mental or emotional distress caused by it." Id. at 455, 276 S.E.2d at 336 (emphasis added).

The factual forecast herein, taken in a light most favorable to Plaintiffs, fails as a matter of law to establish "extreme and outrageous conduct". Plaintiffs have proffered no evidence tending to show that the deputies sought to shoot Hensley in the head or to kill him in a particularly traumatizing manner with the intent to inflict severe emotional distress upon the decedent's two daughters who were present at the time. Plaintiffs have pointed to no evidence in the record from which the Court could infer that Beasley or Price maintained any animosity toward Rachelle or H.H. Plaintiffs have proffered no evidence that Price and Beasley even knew anything about Rachelle and H.H. before that fateful day such that the deputies' killing of their father could be viewed as a calculated effort to strike fear in their hearts. As such, this element is missing.

The doctrine of transferred intent does not save the Plaintiffs' claim. The intent to assault X can support a claim for assault by Y, a by-stander. Holloway, 109 N.C. App. at 417, 428 S.E.2d at 461. There is, however, no evidence that Defendants Price and Beasley intended to terrify the decedent. The evidence in the light most favorable to the Plaintiffs is that they

maliciously intended to kill him. That intent does not support Plaintiffs' IIED claim because it was not the intent of the deputies to strike fear into the victim, whether the victim is considered to be the decedent or his daughters. For these reasons, the deputies' motion for summary judgment on this claim, therefore, should be allowed.

VI.     Plaintiffs' Claims Against the Insurance Company Defendants.

Pursuant to their seventh claim, Plaintiffs allege that Defendant The Ohio Casualty Insurance Company and Defendant West American Insurance Company, as sureties on the Haywood County Sheriff's statutory bond, are liable to the Plaintiffs for all torts committed by the deputies in the performance of their duties as employees of the Haywood County Sheriff's Department. [Doc. 26 at 16].

In North Carolina, "[e]very person injured by the neglect, misconduct, or misbehavior in office of any clerk of the superior court, register, surveyor, sheriff, coroner, county treasurer, or other officer, may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds." Massasoit v. Carter, 439 F.Supp.2d 463, 485 (M.D.N.C. 2006) citing N.C. Gen. Stat. § 58–76–5. Such suits can be maintained not just for the actions of the sheriffs themselves, but also based on the actions of their deputies while acting under color of law. Massasoit, 439 F.Supp.2d at 485.

Thus, the statutory bond works as a waiver of the governmental immunity of the sheriff's deputies with regard to the state law claims where, as here, the surety is joined as a party. Messick v. Catawba County, 110 N.C. App. 707, 714–15, 431 S.E.2d 489, 494 (1993). This waiver covers the intentional torts of assault and battery. State ex rel. Cain v. Corbett, 235 N.C. 33, 69 S.E.2d 20 (1952).

The insurance company Defendants acknowledge that if any of Plaintiffs' tort claims survive summary judgment, Plaintiffs' claim against them survives as well. These sureties, however, argue that the Plaintiffs have failed to produce evidence sufficient to support any tort claim against the deputies. [Doc. 40 at 25]. For the reasons stated above, several of the Plaintiffs' tort claims survive summary judgment, and therefore the claims on the bonds survive to the same extent. The sureties' motion for summary judgment, therefore, should be denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] as to Defendant Michael Scott Price and Defendant Keith Allen Beasley is **DENIED** with regard to Plaintiffs' First, Third, Fourth, Sixth, and Eighth Causes of Action.

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] as to all Defendants is **GRANTED** with regard to Plaintiffs' Second Cause of Action and such claim is hereby **DISMISSED.**

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] as to Defendant Bobby R. Suttles, Defendant Larry Bryson, and Defendant David Mitchell is **GRANTED** with regard to all of Plaintiffs' Causes of Action against them and such Defendants are hereby **DISMISSED** from this matter.

**FINALLY, IT IS ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] as to Defendant The Ohio Casualty Insurance Company and Defendant West American Insurance Company is **DENIED** with regard to Plaintiffs' Seventh Cause of Action.

**IT IS SO ORDERED.**

Signed: March 9, 2016

Martin Reidinger
United States District Judge